**UNITED STATES of America,**
**Appellee,**

**v.**

**Roxanne LUMPKIN, Defendant,**

Mario Williams, Defendant–Appellant.

Docket No. 98–1640

United States Court of Appeals,
Second Circuit.

Argued June 4, 1999.

Decided Aug. 19, 1999.

Kimberly A. Schechter, Federal Public Defender's Office, Western District of New York, Buffalo, NY, for Defendant–Appellant.

Gregory L. Brown, Assistant United States Attorney, Buffalo, N.Y. (Denise E. O'Donnell, United States Attorney for the Western District of New York, Buffalo, NY, on the brief), for Appellee.

Before: WALKER and OAKES, Circuit Judges, and GOLDBERG,* Judge.

GOLDBERG, Judge:

Mario Williams was convicted in the United States District Court for the Western District of New York (Arcara, J.) on May 18, 1998, following a jury trial, of possessing crack cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. The district court sentenced Williams to a term of 41 months imprisonment, to be followed by 36 months of supervised release. Williams appeals the judgment of conviction and makes seven claims of error, all of which pertain to the defense's theory of misidentification and all of which we reject. We write principally to address two of these claims: (1) whether the district court erred when it held that Williams's co-defendant, Roxanne Lumpkin, could properly invoke her Fifth Amendment privilege not to testify; and (2) whether the district court erred in refusing to allow Williams's expert witness to testify on the relationship between witness confidence in identification and the accuracy of that identification. For the reasons stated herein, we affirm the judgment of the district court.

## I.

As part of an assignment for the Career Criminal Task Force ("CCTF"), Detective James Galie, Jr. of the Niagra Falls Police Department and Investigator Christine Sherer–Young of the New York State Police were investigating drug trafficking in the Townsend Street area of Buffalo, New York in the early afternoon of September 25, 1996. Driving in an unmarked car, the officers were soon approached by a female, later identified as Lumpkin, and asked if they wanted to purchase drugs. Galie responded that he was interested in purchasing an "eight ball" of cocaine base, also known as crack cocaine. Lumpkin proceeded alone to a residence at 67 Townsend Street but returned shortly thereafter, stating she was unable to make a purchase.

Lumpkin then entered the officers' car and directed Galie to a nearby location. Upon arriving at the appointed destination, Lumpkin exited the vehicle and crossed the street, where she met with a young male for a period of approximately thirty seconds. Both Galie and Sherer–Young testified that they had an unobstructed view of Lumpkin and her male counterpart from a distance of approximately ten to twenty feet. At this point, both officers observed the male hand a package to Lumpkin, who then returned to the vehicle. Galie paid a sum of cash to Lumpkin in return for contents from the package, later identified as crack cocaine.

In a written report made after this first transaction, Galie described the male in the transaction as "wearing blue camouflage pants, a hooded sweatshirt and [in his] early 20s." As part of their undercover operation, Galie and Sherer–Young also concealed video and audio recording equipment in a gym bag that sat on the rear dash of their car. The video camera recorded images to the left and left-front side of the driver. Although overexposed, an enhanced recording of the first transaction shows Galie looking in the direction of the two individuals at the time the transaction took place. In addition, Galie and Sherer–Young wore wires and broadcast

---

* Honorable Richard W. Goldberg, of the United States Court of International Trade, sitting by designation.

updates that were monitored from a remote location by Detective James McMahon, the lead officer of the CCTF investigation.

Nearly two hours later, Galie and Sherer-Young returned to the vicinity of the earlier transaction. Both officers observed the same unidentified male who negotiated with Lumpkin in the area. On this occasion, however, another male, approximately 5'8" tall with dredlock style hair, approached Galie to ask if they were interested in purchasing drugs. Again, Galie informed the individual that he desired an "eight ball," at which point the individual walked over to the male seen earlier with Lumpkin. Galie and Sherer-Young testified that this transaction also was completed in approximately thirty seconds and that they had an unobstructed view from a distance of approximately twenty feet. During this transaction, Galie observed the male who had earlier given drugs to Lumpkin again give drugs to the second intermediary. The intermediary then returned with the requested drugs, and Galie obtained them in exchange for cash. After the second transaction, Galie and Sherer-Young proceeded to CCTF headquarters for debriefing. There, Detective McMahon displayed a single photograph of Williams to the two undercover officers. Both officers identified Williams, the individual pictured in the photograph, as the male involved in the two drug transactions that day.

On January 7, 1997, Williams was charged in a three-count indictment. The first count alleged a conspiracy to distribute drugs with co-defendant Lumpkin. The remaining counts alleged possession with intent to distribute in connection with the two drug transactions on September 25, 1996. Prior to trial, Williams filed a motion to suppress the anticipated in-court identifications by Galie and Sherer-Young. Magistrate Judge Carol Heckman issued a report and recommendation, concluding that while the photo identification made by the officers during the debriefing session was impermissibly suggestive and, hence, could not be introduced as evidence, Galie and Sherer-Young nevertheless had an independently reliable basis upon which to make in-court identifications. The district court adopted Judge Heckman's report and recommendation following *de novo* review.

Then, both prior to and during trial, Williams filed a series of motions *in limine*. Specifically, Williams first requested permission to offer testimony from Michael R. Lieppe, Ph.D., an expert in the field of eyewitness identification. The district court certified Dr. Lieppe as an expert and permitted his testimony on certain subjects, yet declined to allow testimony on the relationship between witness confidence in identification and the accuracy of that identification. Williams also sought to prevent Officer James Reese of the Buffalo Police Department from testifying that he often saw Williams in the area where the drug sales occurred. The district court denied this motion. Finally, during trial, the government dropped the conspiracy count against Williams after his co-defendant, Lumpkin, entered a guilty plea. Williams still planned to call Lumpkin as a witness, however, anticipating that she could provide exculpatory testimony. Yet, when it became apparent that Lumpkin would be allowed to invoke her Fifth Amendment right against self-incrimination, Williams filed another motion. This time, Williams sought to offer testimony from an investigator for the public defender's office, William Gethoefer, who planned to testify concerning allegedly exculpatory hearsay statements made to him by Lumpkin. The district court also denied this motion. After a four-day trial, the jury returned a guilty verdict on the two remaining counts of the indictment. Williams filed a timely notice of appeal, and the instant appeal followed.

## II.

### A. *Fifth Amendment Privilege of Co-Defendant*

Williams first argues the district court erred when it allowed Lumpkin to invoke

her Fifth Amendment right not to testify. According to Williams, Lumpkin's anticipated testimony, including the fact that she knew Williams but never purchased drugs from him, was exculpatory and did not conflict with her plea colloquy. At the time Lumpkin was called as a witness, she had pled guilty but had not been sentenced.

In deciding if the privilege was properly invoked, the district court conducted a hearing outside the presence of the jury. As part of this hearing, Williams's counsel put the following series of questions to Lumpkin:

1) did she recall seeing the videotape concerning the September 25, 1996 incident;

2) did she plead guilty to a conspiracy to distribute drugs on that day;

3) did she remember from whom she purchased drugs on that day;

4) did she recall selling drugs to Williams;

5) did she ever see Williams wearing blue camouflage pants;

6) was she under the influence of drugs on the day of the incident; and

7) did she recall conversing with an African–American male prior to delivering drugs to two white individuals in a car.

To each question, Lumpkin invoked the Fifth Amendment. The district court then ruled that because Lumpkin's testimony exposed her to federal prosecution for perjury, as well as state prosecution for similar acts, she had a valid Fifth Amendment privilege. Williams claims the district court's decision deprives him of his own Fifth Amendment due process rights and of his Sixth Amendment right to present witnesses in his favor.

■ As an initial matter, the Supreme Court recently made clear that the assertion of the privilege against self-incrimination survives a guilty plea. *See Mitchell v. United States*, —— U.S. ——, ——, 119 S.Ct. 1307, 1313, 143 L.Ed.2d 424 (1999)

(holding a defendant could assert her Fifth Amendment right not to testify at sentencing); *see also United States v. Bahadar*, 954 F.2d 821, 825 (2d Cir.1992) (finding a witness who had pled guilty but had not yet been sentenced could assert his Fifth Amendment privilege not to testify). Thus here, the fact that Lumpkin had entered a guilty plea did not negate her ability to invoke the Fifth Amendment privilege. The open question, however, is whether Lumpkin had a valid claim of privilege.

■ The Fifth Amendment provides in part that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. The Supreme Court has also made clear that "[t]o sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman v. United States*, 341 U.S. 479, 486–87, 71 S.Ct. 814, 95 L.Ed. 1118 (1951). And, the privilege extends not only to those disclosures that in and of themselves would support a conviction, but also to those that might "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Id.* at 486, 71 S.Ct. 814. At the same time, Fifth Amendment privilege claims should be closely scrutinized because allowing a witness not to testify compromises the Sixth Amendment right of an accused "to have compulsory process for obtaining witnesses in his favor." *Washington v. Texas*, 388 U.S. 14, 17, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967).

■ We find Lumpkin was subject to a real threat of prosecution for perjury. First, Williams's counsel asked Lumpkin whether she recalled from whom she purchased drugs on September 25, 1996, in anticipation that Lumpkin would testify she never purchased drugs from Williams and further that she had no agreement

with him to sell drugs. This anticipated testimony runs counter to Lumpkin's earlier plea colloquy, however, wherein she stated that she purchased and sold drugs on September 25, 1996. While Lumpkin stated that she was not entirely sure from whom she purchased the drugs, she did acknowledge the government's proffer that she received the drugs from Williams. Lumpkin's anticipated testimony also undermines her admission in the plea agreement that she, in fact, conspired to sell crack cocaine on September 25, 1996. Similarly, if Lumpkin had denied having a conversation with an African–American male prior to selling drugs to two white individuals, she would have directly contradicted her sworn plea colloquy. Again, during the plea colloquy, Lumpkin agreed that she purchased drugs from an individual on September 25, 1996 (whom the government identified as Williams), and then sold them to two undercover officers.

Moreover, while anticipated responses to other questions posed may not have immediately contradicted her plea colloquy, it is possible that as counsel probed Lumpkin's reliability, she may have exposed herself to a perjury charge. It is entirely foreseeable that in responding to further questions, on cross if not direct, Lumpkin would have contradicted other aspects of her plea colloquy or made further admissions and, in so doing, would have been liable for a perjury charge or other federal or state prosecution. Because there was a real potential for injurious disclosure had she not invoked her Fifth Amendment privilege, the district court correctly found Lumpkin had a valid claim of privilege.

### B. Admission of Hearsay Testimony Under Rule 804(b)(3)

■  Since Williams was unable to elicit direct testimony from Lumpkin, he attempted to introduce testimony from the public defender's investigator, Gethoefer, concerning exculpatory hearsay statements made to him by Lumpkin. Specifically, Gethoefer proposed to testify that,

on the day before she entered her guilty plea, Lumpkin told him (1) she did not know Williams, (2) she never purchased drugs from Williams, and (3) she never saw him wearing blue camouflage pants. Lumpkin allegedly made these statements to Gethoefer in her attorney's office, though her attorney was not present. Gethoefer also made a contemporaneous written record of his alleged conversation with Lumpkin. Williams argues the district court should have admitted the testimony under Rule 804(b)(3), the penal interest exception to the hearsay rule.

Federal Rule of Evidence 804 provides as follows:

(b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

\* \* \*

(3) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject the declarant to civil or criminal liability, or to render invalid a claim by the declarant against another, that a reasonable person in the declarant's position would not have made the statement unless believing it to be true. A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.

Fed.R.Evid. 804(b)(3). The district court found that the proposed hearsay testimony satisfies all elements of Rule 804(b)(3) except for one—trustworthiness. Specifically, the district court concluded Gethoefer's hearsay testimony should not be admitted because there were not sufficient indicia of trustworthiness. Williams contests this finding, claiming the alleged statements were made in an attorney's office, were accompanied by a contemporaneous written record and, thus, were trustworthy.

We review a district court's decision to exclude a statement under Rule 804(b)(3) for abuse of discretion. *See United States v. Doyle*, 130 F.3d 523, 544 (2d Cir.1997). To evaluate whether a statement is sufficiently trustworthy, we look to evidence that corroborates both the declarant's trustworthiness and the truth of the statement. *See id.*

Here, Lumpkin, the declarant, entered a plea agreement the day after making the contested hearsay statements to Gethoefer. In her sworn plea colloquy, Lumpkin made admissions that conflict with the hearsay statements offered by Gethoefer. For instance, Gethoefer proposed to offer a hearsay statement from Lumpkin that she never purchased drugs from Williams. This is at odds with her sworn plea colloquy. Specifically, in the plea colloquy, counsel for the government stated the prosecution was prepared to offer testimony at trial from two officers who observed Lumpkin purchasing drugs from Williams on the day in question. Lumpkin then responded she understood this was the testimony that would be offered at her trial but noted that she was not entirely sure from whom she purchased the crack cocaine. Notwithstanding Lumpkin's inability to recall from whom she purchased drugs, her decision to acknowledge the government's proposed evidence against her and her sworn admission that she purchased drugs is enough to place her sworn statement at odds with her proposed hearsay statement. The inconsistency between Lumpkin's sworn plea colloquy and the proposed hearsay statements she made to Gethoefer plainly detracts from Lumpkin's reliability. The inconsistencies even suggest certain portions of Lumpkin's stories may have been fabricated. That the alleged statements were made in an attorney's office or that contemporaneous notes were taken simply does not outweigh our concern, and the district court's concern, that the declarant's reliability is suspect. Consequently, the proposed hearsay statements are untrustworthy. We therefore reject the claim that the district court

abused its discretion when it refused to allow Gethoefer's testimony under Rule 804(b)(3).

### C. *The So–Called "Other Crimes" Evidence*

At trial, the district court allowed the prosecution to call Officer Reese, a Niagra Falls police officer who testified he often saw Williams in the area where the relevant drug transactions occurred. Williams claims the district court erred in allowing this testimony because it was impermissible propensity testimony that should have been excluded under Rule 404(b). We disagree.

Rule 404(b) provides in part that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed.R.Evid. 404(b); *see also Huddleston v. United States*, 485 U.S. 681, 685–86, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). We review a district court's decision to admit evidence of other crimes for abuse of discretion. *See United States v. Bok*, 156 F.3d 157, 165 (2d Cir.1998). Similarly, "[d]eterminations of relevance are entrusted to the sound discretion of the district court, and we will not override its decision unless arbitrary or irrational." *United States v. Rubin*, 37 F.3d 49, 52 (2d Cir.1994).

Williams's argument fails because Rule 404(b) is not controlling here; there is no "other crimes, wrongs, or acts" evidence at issue. More concretely, Reese testified he observed Williams in the vicinity of the drug sales several times in the few months prior to the transactions. Importantly, Reese did not testify that he observed Williams engaging in criminal or other wrongful conduct. Reese's repeated observations of Williams in a certain area over a period of time does not qualify as evidence of a crime or bad act. Put another way, nothing in Reese's observations indicates that Williams is of bad character. Therefore, Reese's testimony simply does

not fall within the ambit of other crimes evidence that may be excluded under Rule 404(b).

In addition, Reese's testimony, which established that Williams frequented the area where the drug sales took place, was particularly relevant in a case where the defendant claimed he was misidentified. And, we find nothing in this testimony to be unduly prejudicial. Accordingly, the district court acted well within its discretion when it allowed Reese's testimony.

### D. *In–Court Identifications*

■ Because the single photo of Williams shown by McMahon to Officers Galie and Sherer–Young during the debriefing session was impermissibly suggestive under *United States v. Concepcion,* 983 F.2d 369, 377–79 (2d Cir.1992), the trial court properly suppressed this pretrial identification. After this ruling, however, the court decided Galie and Sherer–Young still had independently reliable bases upon which to make in-court identifications of the defendant. Williams claims the district court erred on this issue, arguing his Fifth Amendment right to due process was violated. Specifically, Williams contends the officers were careless in their observations of the suspect, noting in particular that discrepancies in the record exist as to the suspect's height. Williams also argues identifications made by law enforcement officials are no more reliable than those made by average citizens. Finally, Williams maintains that as a general matter, cross-race identifications are less reliable than identifications of the same race. These factors, according to Williams, demonstrate that the officers' identification testimony was unreliable.

■ We review a district court's decision to admit identification evidence for clear error. *See United States v. Ciak,* 102 F.3d 38, 42 (2d Cir.1996).

Where, as here, there is the potential taint of suggestive pre-trial identification procedures, the court must decide whether to permit an in-court identification by weighing the degree of suggestiveness of these procedures against "factors suggesting that [the] in-court identification may be independently reliable rather than the product of the earlier suggestive procedures."

*Id.* (quoting *United States v. Maldonado–Rivera,* 922 F.2d 934, 973 (2d Cir.1990)). The circumstances here lead us to conclude that Galie and Sherer–Young held independently reliable bases for their in-court identifications of Williams. Both officers had unobstructed views of the suspect selling crack cocaine on not one, but two occasions. In addition, on each occasion, the officers observed Williams during daylight, from a distance of approximately ten to twenty feet, and for a period of at least thirty seconds. The officers also testified that upon their return to the area of the drug sales, they immediately recognized Williams as the individual who sold Lumpkin drugs earlier in the afternoon. Taken together, these factors form sufficient grounds to conclude the officers' in-court identifications were reliable. And, neither the noted discrepancy in the record as to defendant's height, nor the alternative theories concerning identification testimony proposed by defendant undercut the reliability of the witnesses' identifications. Accordingly, we find no error in the district court's decision to allow the in-court identifications.

### E. Correlation Between Confidence and Accuracy in Eyewitness *Identifications*

■ Williams sought to offer testimony from his expert witness, Dr. Lieppe, that the degree of confidence a witness purports to have in his or her identification does not correlate to the accuracy of that identification. Specifically, during an *in limine* hearing, Dr. Lieppe relied on and summarized a series of scientific studies, all of which conclude that confidence in identification is not a good predictor of accuracy. The trial court precluded Dr. Lieppe from testifying on this issue at

trial, ruling the testimony might confuse or mislead the jury. On appeal, Williams contends the trial court erred because aside from the officers' identification testimony, the government had a marginal case against him. And, to rebut the natural assumption that the confidence shown by Galie and Sherer–Young in identifying Williams indicated reliability, Williams maintains that testimony illuminating the weak relationship between confidence and accuracy would have been particularly helpful to the jury. Therefore, Williams insists the trial judge erred when it excluded Dr. Lieppe's testimony on this issue. We disagree.

A decision to exclude expert testimony rests soundly with the discretion of the trial court and shall be sustained unless "manifestly erroneous." *See Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (per curiam) (quoting *Salem v. United States Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). A witness qualified as an expert typically will be permitted to testify if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Dr. Lieppe plainly qualifies as an expert and, as the trial court noted, his testimony and the scientific articles may indeed have been scientifically reliable. Yet, in reviewing the use of expert testimony, we also look to see "if it will 'usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it.'" *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) (quoting *United States v. Bilzerian,* 926 F.2d 1285, 1294 (2d Cir.1991)).

Here, Dr. Lieppe's proposed testimony and explication of the scientific studies would have confused the jury's assessment of the officers' credibility. Fundamental to the role of juror as trier of fact is the task of assessing witness credibility. And, a witness's demeanor on the stand, including his or her confidence, impacts the assessment of credibility. By testifying that confidence bears little or no relationship to accuracy in identifications, Dr. Lieppe would effectively have inserted his own view of the officers' credibility for that of the jurors, thereby usurping their role. Indeed, by our estimation, the added aura of reliability that necessarily surrounds expert testimony would have placed the officers' credibility here in jeopardy. As a result, we find Dr. Lieppe's proposed testimony intrudes too much on the traditional province of the jury to assess witness credibility. *See United States v. Smith,* 156 F.3d 1046, 1053–54 (10th Cir.1998) (holding the district court did not abuse its discretion when it excluded expert testimony on the lack of correlation between confidence and accuracy in eyewitness identifications), *cert. denied,* —— U.S. ——, 119 S.Ct. 844, 142 L.Ed.2d 699 (1999); *United States v. Smith,* 122 F.3d 1355, 1358–59 (11th Cir.) (per curiam) (same), *cert. denied,* —— U.S. ——, 118 S.Ct. 614, 139 L.Ed.2d 500 (1997); *but see United States v. Stevens,* 935 F.2d 1380, 1400–01 (3d Cir.1991) (finding that expert testimony on the confidence versus accuracy factor should have been admitted because it could prove helpful to the jury). Accordingly, the trial court committed no error when it decided to exclude Dr. Lieppe's testimony on witness confidence in identifications.

## F. Exclusion of Third–Party Suspect's Photograph

At trial, Williams presented his mother and sister as defense witnesses. Both individuals testified that Williams never wore blue camouflage pants. They stated, however, that another individual, Darnell Carter, wore blue camouflage pants, was approximately 5'8" tall, and was known to frequent the area where the drug sales were made. To bolster this trial testimony, Williams attempted to introduce a photograph of Carter into evidence. The trial court refused to admit the photograph. Williams contests the ruling, claiming the photograph would

have created reasonable doubt in light of the testimony from his mother and sister.

We review a trial court's decision concerning the relevance of proffered evidence for abuse of discretion. *United States v. Anglin*, 169 F.3d 154, 162 (2d Cir.1999). We find the district court did not abuse its discretion. Williams points to *Lyons v. Johnson*, 99 F.3d 499 (2d Cir.1996), as support for his assertion that the district court should have admitted the photograph of Carter. In *Lyons*, defendant and another individual of similar stature were each identified at the scene of a shooting wearing black leather jackets and gold-cap front teeth. *Lyons*, 99 F.3d at 500–01. Although charged with the shooting, the defendant claimed the other individual actually was the trigger man. As part of his defense, the defendant attempted to exhibit the other individual, wearing his gold-cap teeth, to the jury. *See id.* at 501. The trial judge refused the display. *See id.* We concluded the trial court erred, stating "[a] physical display of [the other individual] wearing gold fronts was relevant and ought to have been admitted." *Id.* at 503. Similarly, Williams contends he should have been allowed to introduce the photograph of Carter to demonstrate that he, Williams, was misidentified.

In *Lyons*, however, there was no dispute that both individuals were at the scene of the crime. In this case, there is no substantive link between Carter and the charged crimes. While Williams's mother and sister testified that Carter fit the description of the suspect, so too may have numerous other individuals in the neighborhood where the transactions occurred. And, Williams points to no evidence that places Carter in the vicinity of the drug sales when they occurred. Without any foundation that actually links Carter to the crimes, the proffered photograph was irrelevant and potentially misleading. We therefore reject the claim that the trial court abused its discretion when it refused to admit the photographic evidence.

### G. *Cumulative Error Claim*

■ Finally, Williams claims the cumulative effect of the district court's errors warrants a new trial. *See Taylor v. Kentucky*, 436 U.S. 478, 487–88 & n. 15, 98 S.Ct. 1930, 56 L.Ed.2d 468 (1978) (concluding that "the cumulative effect of the potentially damaging circumstances of this case violated the due process guarantee of fundamental fairness."). We find this argument without merit. In short, the trial court did not commit reversible error as to any of the challenges raised by defendant, and the accumulation of non-errors does not warrant a new trial. *Cf. United States v. Hurtado*, 47 F.3d 577, 586 (2d Cir.1995) (rejecting defendant-appellant's claim that the collective impact of the alleged errors warranted a new trial even if none of the claims standing alone precipitated reversal).

### III.

For the foregoing reasons, we affirm the judgment of conviction entered against defendant Williams by the district court.