15-1444-cr(L)
*United States v. Gill*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term 2016

(Argued: February 9, 2017      Decided: August 30, 2017)

Docket Nos. 15-1444-cr(L); 15-1447-cr (CON) 15-1450-cr(CON)

UNITED STATES OF AMERICA,

*Appellee*,

*v.*

SEAN DUPREE, DERRICK LEWIS, AKA Boobie, DONALD LEWIS, AKA Don Don,
BONITA MBAYE, MICHAEL MOORE, NORBERT GRIGGER, AKA Jah, DENNIS PORTER,
AKA Finesse, ROLAND DOWE, AKA Terrell,

*Defendants*,

BRIAN GILL, AKA Brawl, DAVID GILL, AKA Plot,
SAMUEL WACO MCINTOSH, AKA Samuel McIntosh, AKA Waco,

*Defendants-Appellants*.[*]

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

---

[*]      The Clerk of Court is directed to amend the caption to conform with the above.

Before:

LIVINGSTON, CHIN, AND CARNEY, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Eastern District of New York (Amon, *J.*), convicting all three defendants-appellants of murder and conspiracy to murder in furtherance of a drug trafficking conspiracy in Staten Island in 1994, and two of the three defendants-appellants of engaging in a drug trafficking conspiracy in Staten Island from 2011 to 2013.  Defendants appeal their convictions on several grounds, including the failure of the superseding indictment to allege drug quantity, the admission of evidence of a prior drug conspiracy in Maryland in the early 1990s, and the sufficiency of the evidence of the charged narcotics conspiracies.

AFFIRMED.

NADIA I. SHIHATA, Assistant United States Attorney (Jo Ann M. Navickas, Alicyn L. Cooley, Assistant United States Attorneys, *on the brief*), for Bridget M. Rohde, Acting United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

PETER F. LANGROCK, Langrock Sperry & Wool, LLP, Middlebury, Vermont, *for Defendant-Appellant Brian Gill.*

VIVIAN SHEVITZ, South Salem, New York, *for Defendant-Appellant David Gill.*

2

CHRISTOPHER P. CONNIFF (Elizabeth Bierut, *on the brief*),
Ropes & Gray LLP, New York, New York, *for Defendant-Appellant Samuel Waco McIntosh.*

---

CHIN, *Circuit Judge*:

Defendants-appellants Brian Gill ("Brian"), David Gill ("David"), and Samuel Waco McIntosh ("Samuel") -- three brothers -- appeal from judgments of the district court (Amon, *J.*), convicting them of committing and conspiring to commit the drug-related murder of Michael Dawson in Staten Island in 1994, in violation of 21 U.S.C. §§ 848(e)(1)(A) and 846. Brian and David also appeal from their convictions for conspiring to distribute at least 280 grams of cocaine base in Staten Island from 2011 to 2013, in violation of 21 U.S.C. §§ 841(b)(1)(A)(iii) and 846.

Defendants principally challenge the failure of the superseding indictment to allege that the drug conspiracy underlying the murder charges involved at least 280 grams of cocaine base, the admission at trial of evidence of their involvement in a drug conspiracy in Maryland in the early 1990s, and the sufficiency of the evidence of the charged narcotics conspiracies. In addition, David and Samuel assert that the court erroneously admitted certain witness

3

testimony as statements against penal interest and that another witness committed perjury warranting vacatur.

We conclude that the defect in the superseding indictment did not amount to plain error, the district court did not abuse its discretion in admitting the challenged evidence, there was sufficient record evidence to support the convictions, and the claim of perjury is unsubstantiated. Accordingly, the judgments of the district court are affirmed.

## BACKGROUND

I. *The Facts*

Because defendants appeal their convictions following a jury trial, "our statement of the facts views the evidence in the light most favorable to the government, crediting any inferences that the jury might have drawn in its favor." *United States v. Rosemond*, 841 F.3d 95, 99-100 (2d Cir. 2016) (quoting *United States v. Dhinsa*, 243 F.3d 635, 643 (2d Cir. 2001)).

A. *The Prior Drug Conspiracy in Maryland*

In the early 1990s, Brian and Samuel sold crack cocaine in Maryland. Brian asked his friend Norbert Grigger to help and provided him an apartment for drug sales and two guns for protection. Brian bought powder cocaine from Manhattan and Staten Island in New York and cooked it into crack cocaine. Each

4

week, they sold 500 to 800 grams of crack cocaine and made approximately $40,000 to $50,000.

Brian stored the drugs in his Maryland apartment, along with ammunition, bullet-proof vests, and approximately 20 guns. He and Samuel often carried guns. Grigger understood that he might need to use guns for protection from rival drug dealers. Brian, Samuel, and Grigger once got into a "standoff" with a rival group after a dispute over drug sales, and during the confrontation "[e]veryone" drew their guns. Samuel App. 288. The three men also made plans to retaliate against another group of rival dealers by "tak[ing] them, handcuff[ing] them, driv[ing] them out to the middle of the woods and shoot[ing] them." *Id. at* 290. Brian procured a U-Haul truck and handcuffs, but the remaining plans were never carried out.

B.    *The 1994 Drug Conspiracy*

In April 1994, Brian began selling crack cocaine with cooperating witness Donald Lewis at 160 Park Hill Avenue ("160 Park Hill") in Staten Island. Brian bought 125 grams of powder cocaine from Washington Heights in Manhattan every three to four days, which yielded 120 to 121 grams of crack cocaine that would sell for $8,000 or $9,000. After a few weeks, Brian and Lewis began selling cocaine in rotating shifts around the clock. Each man had access to

5

a gun for protection from other dealers. David and Samuel also sold cocaine at 160 Park Hill.

At some point, rival dealer Michael Dawson asked to join the 160 Park Hill operation. Brian opposed the idea. Dawson nevertheless joined Lewis in selling cocaine on the night shift. Dawson and Lewis made three trips to buy 150 grams of powder cocaine each time, which resulted in 140 grams of crack cocaine and $13,000 or $14,000 in profit after every trip. Brian and his brothers confronted Dawson, beat him up, broke into his car, and stole his drugs and money. Brian began acting "shady" and "funny" toward Lewis and talked to him less frequently. *Id.* at 220.

### C. *The Dawson Murder*

On June 22, 1994, Brian complained to Lewis that Charles Gordon, Lewis's cousin, was robbing their customers whenever he and Lewis were not in the 160 Park Hill area. Brian walked toward Gordon and hit him in the face. The two men fought. Lewis got his gun because "it looked like it was going to get crazy," *id.* at 226, and told Gordon to leave. Brian, in turn, got his gun and yelled, "[W]here's he at now, where's he at now, where's he at." *Id.* at 223. Brian looked upset and told Lewis and Lewis's brother, who was the only other person in the

area, that they "shouldn't be there when his brothers get here, wait until his brothers get here." *Id.*

David and Samuel arrived within a few minutes of each other. Brian declared that Gordon and Lewis's brother had "jumped" him. *Id.* at 223. Lewis "yell[ed] back and forth across the street that [Brian was] lying, that [his] cousin and [his] brother didn't jump him." *Id.* at 224. A security guard told the men to take their argument elsewhere. During the altercation, Dawson came and tried to help Lewis sell crack cocaine to customers, but David blocked their efforts.

Dawson pulled out a gun. He and Brian brandished their guns at each other during "a little standoff." *Id.* at 224. Lewis talked them down. Brian continued to "talk[] shit" and went inside the 160 Park Hill building, followed by David, Lewis, and Lewis's brother. *Id.* at 225. David pulled a gun on Lewis's brother once they were inside, but Brian directed him to beat Lewis's brother up instead. David punched Lewis's brother in the face.

Meanwhile, a customer in a car had pulled up in front of the 160 Park Hill building. Samuel approached the car from the driver's side while Dawson approached it from the passenger side. Samuel completed the sale, pulled out a gun, and shot Dawson. Samuel ran inside the building and grabbed

his brothers. Brian and David each came out and shot in Dawson's direction. Lewis found Dawson bleeding in the street. Dawson later died.

D. *The 2011-2013 Drug Conspiracy*

In March 2011, Lewis saw Brian selling crack cocaine again near 160 Park Hill. The two men went to New Brighton in Staten Island to buy 15 to 20 grams of crack cocaine, which they sold to customers in the 160 Park Hill area. Brian, Samuel, and Lewis bought 25 to 30 grams more of cocaine from New Brighton and split the batch between them.

Brian and Lewis sold cocaine daily in the 160 Park Hill area. Lewis bought 10 to 30 grams of cocaine for them twice a week. In early 2012, Brian told Grigger that he was selling cocaine, that "Park Hill was wide open[,] and [that] there was a lot of money to be made." *Id.* at 300. Grigger offered to get Brian cocaine on consignment because he knew Brian could sell it.

Grigger then delivered 500 grams of powder cocaine to Brian and suggested that he sell cocaine 3.5 grams at a time. Brian showed Grigger how he cooked and packaged cocaine. Grigger agreed to bring "workers" to 160 Park Hill to "handle the everyday sales of hand-to-hand business dealing with the customers, set up various drug spots in different buildings to receive the revenue from the drugs, and to create shifts," just like "the way [they] did [it in]

8

Baltimore." *Id.* at 302. Grigger understood that Brian would pay him for the cocaine once he sold all of it.

After Brian paid Grigger back in full, Grigger supplied him with two more batches of cocaine on consignment, one with 250 grams and one with nearly 200 grams. In addition, Grigger sold Brian 20 to 50 grams of cocaine approximately nine times. Grigger visited Brian several times in 2012 and 2013 to pick up money and deliver cocaine. During his visits, Grigger watched Brian cook crack cocaine and sell it to customers, observed David selling cocaine, and "sometimes" saw Samuel in the area. *Id.* at 304.

When Lewis was released from prison, Brian gave him a thousand dollars' worth of crack cocaine, which Brian let him sell in the 160 Park Hill area. Lewis sold 20 to 25 grams of the crack cocaine to Brian's customers. Brian bought "a big rock" of cocaine in Brooklyn and gave Lewis another 75 grams. *Id.* at 231. Lewis had Brian buy him 20 to 30 grams of powder cocaine every other week, for about a month.

Lewis testified that Brian sometimes sold drugs in David's and Samuel's presence at 160 Park Hill. The three defendants were arrested in 2013.

## II.    *The Proceedings Below*

In October 2014, defendants were charged by superseding indictment with (1) killing and conspiring to kill Dawson in 1994 while conspiring to distribute cocaine base in Staten Island (an offense punishable under 21 U.S.C. § 841(b)(1)(A)), in violation of 21 U.S.C. §§ 846 and 848(e)(1)(A) (Counts One and Two); and (2) conspiring to distribute and possess with intent to distribute at least 280 grams of cocaine base in Staten Island from 2011 to 2013, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A)(iii) (Count Three).

Trial began in October 2014 and lasted approximately four weeks. The government called 30 witnesses, including Lewis and Grigger, and introduced recordings of 911 calls into evidence. The district court reserved decision on defendants' motions for judgments of acquittal at the close of the government's case. David's counsel called one witness on behalf of the three defendants.

On November 13, 2014, the jury found Brian and David guilty on all three counts, found Samuel guilty of the 1994 killing and conspiracy charged in Counts One and Two, and acquitted Samuel of the 2011-2013 drug conspiracy charged in Count Three. The court sentenced Brian to three concurrent life terms, David to three concurrent 40-year terms, and Samuel to two concurrent

10

40-year terms.

On April 28, 2015, the court denied Samuel's *pro se* motion for acquittal and a new trial and held that there was ample evidence, including the testimony of witnesses with direct knowledge of the murder and underlying conspiracy, to support his convictions on Counts One and Two. The court thereafter entered judgments against the three defendants.

These appeals followed.

### *DISCUSSION*

Five issues are presented: (1) the omission of drug quantity in Counts One and Two of the superseding indictment, (2) the admission of evidence of the early 1990s Maryland conspiracy as prior bad act evidence, (3) the sufficiency of the evidence for each conviction, (4) the admission of statements against penal interest, and (5) the alleged perjury during trial. We address each issue in turn.

### I. *The Superseding Indictment*

All three defendants argue that their convictions on the murder and related conspiracy counts are unsustainable because Counts One and Two of the superseding indictment do not allege drug quantity. We agree the superseding

indictment was defective but decline to vacate the convictions because the errors were not plain.

### A.   *Applicable Law*

Under the Fifth Amendment to the Constitution, "a defendant has a 'substantial right to be tried only on charges presented in an indictment returned by a grand jury.'" *United States v. Gonzalez*, 686 F.3d 122, 127 (2d Cir. 2012) (quoting *United States v. Miller*, 471 U.S. 130, 140 (1985)).  "An indictment that does not set out all of the essential elements of the offense charged is defective." *Id.*  Federal Rule of Criminal Procedure 7(c)(1) requires an indictment to contain both "a plain, concise, and definite written statement of the essential facts constituting the offense charged" and a citation to the "statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."  Fed. R. Crim. P. 7(c)(1).  The statements of essential facts and statutory citation are separate requirements, and a deficiency in the factual allegations cannot be cured by a statutory citation in the same count.  *Gonzalez*, 686 F.3d at 128.

Although "we have consistently upheld indictments that 'do little more than to track the language of the statute charged and state the time and place (in approximate terms) of the alleged crime,'" *United States v. Walsh*, 194 F.3d 37, 44 (2d Cir. 1999) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113

(2d Cir. 1975)), an indictment charging an aggravated drug offense under 21 U.S.C. § 841(b)(1)(A) "must *always*" include a factual allegation of the drug quantity as an essential element, *Gonzalez*, 686 F.3d at 130 (internal quotation marks omitted). It is not enough for the indictment to make a "simple reference to a drug-quantity-based penalty provision . . . without any language alleging the factual predicate for application of that penalty, and without any other allegations that reasonably permit the inference that the grand jury intended to charge the defendant with the quantity necessary for application of that penalty." *Id.* at 132-33. Thus, an indictment charging an aggravated drug offense under § 841(b)(1)(A) is defective if it does not factually allege the drug quantity involved in the charged offense. *See id.*

We review a challenge based on a factually deficient indictment and raised for the first time on appeal under the plain error standard. *United States v. Cotton*, 535 U.S. 625, 631 (2002). Under this standard, a defendant is not entitled to relief unless there is (1) error that (2) is plain and (3) affects his substantial rights. *Id.* "If all three conditions are met, [we] may then exercise [our] discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id.* (last alteration in original) (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)).

**B.**     *Application*

**i.**     *Failure to Allege Drug Quantity*

Counts One and Two of the superseding indictment charged defendants with killing and conspiring to kill Dawson in violation of § 848(e)(1)(A), which applies to "any person engaging in an offense punishable under section 841(b)(1)(A) of this title . . . who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results." Section 841(b)(1)(A)(iii) establishes penalties for drug offenses involving at least 280 grams of cocaine base. Under § 846, a conspiracy to commit a drug offense under § 841(b)(1)(A) is itself punishable under § 841(b)(1)(A) and, likewise, a conspiracy to commit drug-related murder under § 848(e)(1)(A) is punishable under § 848(e)(1)(A). As a result, a defendant commits, or conspires to commit, a drug-related murder under § 848(e)(1)(A) if he kills or conspires to kill another person while engaged, or conspiring to engage, in distributing at least 280 grams of cocaine base. *See United States v. Santos*, 541 F.3d 63, 67-68 (2d Cir. 2008).

In this case, Count One of the superseding indictment charged:

> On or about June 22, 1994, within the Eastern District of New York, the defendants BRIAN GILL, also known as "Brawl," DAVID GILL, also known as "Plot," and SAMUEL MCINTOSH, also known as "Samuel Gill"

14

and "Waco," together with others, while engaged in one or more offenses punishable under Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute cocaine base, did knowingly and intentionally kill and counsel, command, induce, procure, and cause the intentional killing of Michael Dawson, also known as "NIM" and "NIMS," and such killing did result.

(Title 21, United States Code, Section 848(e)(1)(A); Title 18, United States Code, Sections 2 and 3551 et seq.)

Samuel App. 37-38. Count Two of the superseding indictment charged:

On or about June 22, 1994, within the Eastern District of New York, the defendants BRIAN GILL, also known as "Brawl," DAVID GILL, also known as "Plot," and SAMUEL MCINTOSH, also known as "Samuel Gill" and "Waco," together with others, while engaged in one or more offenses punishable under Section 841(b)(1)(A) of Title 21 of the United States Code, to wit: conspiracy to distribute cocaine base, did knowingly and intentionally conspire to kill and cause the intentional killing of Michael Dawson, also known as "NIM" and "NIMS," and such killing did result.

(Title 21, United States Code, Sections 846 and 848(e)(1)(A); Title 18, United States Code, Sections 3551 et seq.)

*Id.* at 38. Counts One and Two, in other words, charged defendants with violating § 848(e)(1)(A) by killing and conspiring to kill Dawson while engaged in a conspiracy to distribute cocaine base under § 841(b)(1)(A).

Neither count, however, alleged that the underlying drug conspiracy involved at least 280 grams of cocaine base, and thus the superseding indictment did not allege the factual predicate required under § 841(b)(1)(A) and § 848(e)(1)(A). *See* §§ 841(b)(1)(A)(iii), 848(e)(1)(A). There was no statement of

15

drug quantity as an essential fact constituting the charged offenses and no language alleging the factual predicate for the penalty provision in § 848(e)(1)(A). *See* Fed. R. Crim. P. 7(c)(1); *Gonzalez*, 686 F.3d at 130, 132-33. The superseding indictment had to do more than reference §§ 841(b)(1)(A) and 848(e)(1)(A) to allege the essential facts. *See Gonzalez*, 686 F.3d at 128.

We conclude the failure to allege drug quantity constituted a defect in Counts One and Two of the superseding indictment.

### ii. *Plain Error*

Although the omissions of drug quantity in the superseding indictment were error, the errors did not amount to reversible plain error because they did not affect defendants' substantial rights.

The plain error standard applies because defendants challenge the deficiencies in the superseding indictment for the first time on appeal. *See Cotton*, 535 U.S. at 631. The trial transcript reflects that after the district court instructed the jury, defendants drew the court's attention to the failure of the verdict sheet to allege drug quantities for Counts One and Two, but did not raise any sufficiency concerns as to the allegations in the superseding indictment.

The defect in the superseding indictment did not affect defendants' substantial rights. The court instructed the jury with respect to Count One that:

16

In order to prove the charge in Count One against each defendant the government must prove beyond a reasonable doubt each one of the following elements with respect to that defendant. First, that the defendant is guilty of either conspiring to distribute or conspiring to possess with intent to distribute *280 grams or more of cocaine base . . . .*

. . . .

It is an offense punishable under [21 U.S.C. §841(b)(1)(A)] to engage [in a] conspiracy to either distribute or possess with intention to distribute *280 grams or more of a substance containing cocaine base.*

What this means is to find that the government has established the first element, you must first determine whether the government has proven beyond a reasonable doubt that on the date of Michael Dawson's killing, which was on or about June 22nd, 1994, the defendant was engaged in a conspiracy either to distribute *280 grams or more of a substance containing cocaine base* or to possess with intent to distribute *280 grams or more of a substance containing cocaine base.*

Samuel App. 395 (emphasis added). The court also referred to the threshold

quantity of 280 grams of cocaine base three other times in its instructions with

respect to Count One.

The court instructed the jury with respect to Count Two that:

[Count T]wo charges the defendants with conspiring to commit the drug-related murder of Michael Dawson . . . I've already instructed you about the elements of drug-related murder with respect to Count One. That crime is the object of the charged conspiracy. The same instructions apply here, and I will not repeat them. *I already explained to you what it means to conspire to commit a crime and what the government must prove beyond a reasonable doubt before you find the defendant guilty of conspiracy. Those same instructions apply here and I need not repeat them.*

17

> By way of brief summary, in order to prove that a defendant is guilty in the drug-related conspiracy to murder Michael Dawson, the government must establish beyond a reasonable doubt each of the following elements:
>
> First, that two or more persons knowingly and willfully conspired;
>
> Second, that those persons agreed to commit the unlawful act ascribed in Count One, to wit: the knowing and intentional killing of Michael Dawson while engaged in a conspiracy to distribute [] *280 grams of a substance containing cocaine base . . . .*

*Id.* at 397 (emphasis added). The court then sent the jury to the jury room to begin its deliberations.

Defendants raised the drug quantity issue only with respect to the verdict sheet. The court pointed out that it had instructed the jury, several times, that a defendant could be convicted on Count One or Two only if the jury found that he conspired to distribute at least 280 grams of cocaine base. Defendants responded that the verdict sheet specifically referenced a threshold drug quantity with respect to Count Three but not Count One or Two, which they argued could suggest that the jury need not make a finding of drug quantity with respect to the first two counts. The court noted its own "concern . . . that the jury reaches the opposite conclusion, that the 280 grams does not have to be established" as to Counts One and Two, and decided to orally instruct the jury on

18

this issue rather than modify the verdict sheet. *Id.* at 401. The court called the

jury back into the courtroom and instructed:

> I just wanted to clarify an issue that might not have been clear from the verdict sheet. It's clear in the court's instructions, but I didn't want there to be any confusion on the verdict sheet.
>
> You'll see that Counts One and Two do not have any questions about the amount of cocaine base. The reason for that is, in Count One and Two it's actually one of the elements of the offense that the conspiracy involved 280 grams or more of cocaine base. That's an element of the offense on Count One and Two. So I don't ask the question. You could not find the defendant -- any of the defendants guilty of [Count O]ne or [Count T]wo unless you found that that conspiracy in fact involved 280 grams or more of crack cocaine. That's one of the elements.
>
> So I don't ask the question, but it must be a finding that you make to find defendant guilty of Count One or Two, which is different from how Count Three is handled. So I just wanted to clarify that for you.

*Id.* at 401-02.

We conclude that the initial jury instructions and subsequent

clarification made it clear to the jury that drug quantity was an element of both

Counts One and Two and that a conviction on either count required a finding

that the defendant killed Dawson while engaged in a conspiracy involving at

least 280 grams of cocaine base. There is no claim or evidence that the jury

disregarded the court's multiple and express instructions about drug quantity,

and so we presume "that [the] jurors remain[ed] true to their oath and

19

conscientiously observe[d] the instructions and admonitions of the court.'"

*United States v. Esso*, 684 F.3d 347, 352 (2d Cir. 2012) (quoting *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir. 1997)).

Accordingly, the omissions of drug quantity in Counts One and Two of the superseding indictment did not affect defendants' substantial rights and did not constitute reversible plain error. We affirm the convictions of all three defendants on Counts One and Two in this respect.

## II.     *The Prior Drug Conspiracy in Maryland*

Brian and Samuel challenge the admission of Grigger's testimony under Federal Rules of Evidence 404(b) and 403 with respect to uncharged acts that they committed in Maryland before any of the charged acts took place.

Before trial, the government moved to admit testimony that in the early 1990s Brian and Samuel conspired to sell crack cocaine in Maryland, carried guns, and conspired to kill rival drug dealers. It argued that evidence of the uncharged crimes was admissible to show how defendants developed longstanding relationships of trust as brothers and co-conspirators in drug trafficking and murder, and to establish their knowledge and intent with respect to the charged counts.

Shortly before the government elicited the disputed testimony at trial, and in response to David's request "to talk about Mr. Grigger" and address "some outstanding 404(b) issues," the court informed the parties that:

> I thought that [Grigger's testimony] would be admissible both as to knowledge and intent and developed a relationship to the defendants as to one another as well as a relationship to Mr. Grigger and the concern was whether it would have been cumulative. I don't see, at least on what I have heard so far, that it in any way would be cumulative so I am inclined to let it in.

Samuel App. 277. The parties and the court discussed the proper scope of cross-examination with respect to Grigger's criminal history. At the end of the discussion, Brian's counsel clarified with the court:

> MR. PAUL: Judge, just so I understand, Your Honor has ruled that testimony regarding Maryland activities prior to the date of Count One and Two concerning a witness with one or more of these defendants in Maryland is going to be permitted?
>
> THE COURT: Yes.

*Id.* at 281-82. The court granted Brian's and Samuel's requests that the record reflect their continuing objections. The court later referred to its statements as an evidentiary ruling on the admissibility of Grigger's testimony when it explained:

> [Grigger] is going to testify about all the similar act evidence that I have said that could be testified about on the theory of the development of relationships, et cetera, knowledge and intent. I don't believe any defendant has taken that out of the case here.

21

. . . .

> The government provided information in terms of 404(b), the evidence I had before in the past, and we don't need to completely revisit this, but it was evidence related to establishing trust and relationship among the defendants and the witness, although I recognize [Grigger] wasn't involved in Dawson's murder.
>
> As I understand it, in terms of whether the defendants acted knowingly and wil[l]fully in terms of allegations of drug activity, no one has taken that out of the case or has stipulated that out of the case. So, it's relevant to those issues, as well. So, all I can say now is, we're going to go forward with the evidence.

Gov't App. 111, 114. In other words, the court admitted Grigger's testimony of the Maryland acts as non-cumulative evidence of defendants' knowledge, intent, and relationships with each other.

At trial, the government elicited testimony from Grigger that he, Brian, and Samuel sold crack cocaine together in northern Baltimore in the early 1990s. The men bought powder cocaine from suppliers in New York, cooked it into crack cocaine, and stored the crack cocaine in an apartment next to where they sold the drugs. The three of them had access to guns for protection from rival drug dealers. One dispute with rival dealers escalated into an armed standoff, and another dispute resulted in defendants planning to handcuff their rivals and shoot them in the middle of the woods.

The court instructed the jury in the middle of this testimony that "to the extent I gave you instructions earlier about testimony about drug trafficking outside of the charged conspiracy itself, again, this testimony -- the instruction I gave you before also applies to this testimony, as well." Samuel App. 286. The court had previously instructed:

> This evidence of a time period earlier than what's charged in the indictment is not a substitute for proof of the crimes charged in the indictment. It's offered for a limited purpose, which is the establishment of a relationship between the witness and defendants. It also can be considered on the issues of the defendant's knowledge and intent in engaging in later activity. But it cannot be used simply to conclude because someone did something wrong in an earlier period of time, then they must have done something wrong at a later time.

*Id*. at 285.

On summation, the government told the jury:

> From Grigger, you know that [Brian] and [Samuel] had a history of backing each other up with violence to protect their drug turf, to plan and carry out murders together. They did it in Maryland with Grigger prior to Dawson's murder in the early '90s and they did it again in June 1994 when they killed Dawson. The defendants were ready and willing to murder rival drug dealers when their crack dealing and reputation were at risk.
>
> . . . .
>
> So why is what Grigger told you about these years in Maryland, a few years before Dawson's murder, important? First, because it shows you that the relationship between [Brian] and [Samuel] went far beyond being brothers. It shows you that at a time before they murdered Dawson, [Brian] and [Samuel] were willing to back each other up with violence, with murder, to protect their own drug turf. They were willing to plan

23

and carry out murders together. This testimony about Maryland shows you that [Brian] and [Samuel] were ready and willing to murder rival drug dealers when their crack dealing and reputation were at risk.

*Id.* at 382, 383.

On appeal, Brian and Samuel argue that Grigger's testimony should not have been admitted under Rules 404(b) and 403. We review evidentiary rulings for abuse of discretion and will reverse only if there is manifest error that is harmful and affects substantial rights. *United States v. Miller*, 626 F.3d 682, 688 (2d Cir. 2010).

**A.** *Rule 404(b)*

Rule 404(b) prohibits the admission of evidence of prior crimes, wrongs, or acts "to prove the defendant's propensity to commit the crime charged." *United States v. Diaz*, 176 F.3d 52, 79 (2d Cir. 1999) (referring to Fed. R. Evid. 404(b)(1)). The rule does not bar admission if the evidence is used "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or lack of accident." Fed. R. Evid. 404(b)(2).

Under our Circuit's "'inclusionary approach,' prior act evidence is admissible if offered 'for any purpose other than to show a defendant's criminal propensity.'" *United States v. Mejia*, 545 F.3d 179, 206 (2d Cir. 2008) (quoting

*United States v. Garcia*, 291 F.3d 127, 136 (2d Cir. 2002)). The district court can, for example, "admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Diaz*, 176 F.3d at 79 (quoting *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993)). The court can also admit evidence of prior acts as probative of knowledge and intent if the evidence is relevant to the charged offense, *i.e.*, if there is a similarity or connection between the charged and uncharged acts. *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006).

"To determine if the court properly admitted prior act evidence pursuant to Rule 404(b), we consider whether: (1) the prior act evidence was offered for a proper purpose; (2) the evidence was relevant to a disputed issue; (3) the probative value of the prior act evidence substantially outweighed the danger of its unfair prejudice; and (4) the court administered an appropriate limiting instruction." *Garcia*, 291 F.3d at 136.

We conclude that Grigger's testimony of Brian's and Samuel's participation in the Maryland drug operation was properly admitted under Rule 404(b). First, the government presented the Maryland testimony, in compliance with the court's *in limine* ruling, as probative evidence of defendants'

knowledge of the charged drug- and murder-related acts, their intent to engage in these acts, and the development of their relationships with each other. The government offered the evidence for a purpose other than to show criminal propensity, *i.e*, for a proper purpose under Rule 404(b), and did not characterize the testimony on summation as evidence of propensity.

Second, contrary to Brian's arguments, at trial the parties disputed the nature of defendants' relationships and their intent to sell drugs together. Brian claimed he sold drugs as an individual dealer in the "free zone" around the 160 Park Hill building, where it was "every man for himself." Gov't App. 40-41. Samuel asserted that his relationship with Brian was familial, not criminal, and did not involve any joint narcotic conduct. The government disagreed and argued that the three defendants sold drugs together as part of a conspiracy to distribute cocaine, and that they knew and worked with each other as co-conspirators rather than merely as individuals or brothers. The Maryland testimony was relevant to these disputed issues as probative evidence of defendants' knowledge, intent, and relationships as to the charged conduct.

Third, the court issued an appropriate limiting instruction during the testimony and directed the jury to consider the Maryland evidence only as

evidence of knowledge, intent, and the co-conspirators' relationships, and not as propensity evidence or direct proof of the charged acts.

Lastly, the probative value of the Maryland evidence was not substantially outweighed by its prejudicial effect. As discussed, the evidence was probative with respect to the disputed issues of knowledge, intent, and relationships. There was no undue prejudice because the Maryland acts did not involve conduct more serious than the crimes charged, and any prejudicial effect was mitigated by the contemporaneous limiting instruction. *See United States v. Williams*, 205 F.3d 23, 24 (2d Cir. 2000) (concluding there was no undue prejudice under analogous Rule 403 test because "the evidence did not involve conduct more serious than the charged crime and the district court gave a proper limiting instruction").

As a result, Brian's and Samuel's Rule 404(b) challenge to the admission of Grigger's testimony fails on the merits, and their arguments to the contrary are unpersuasive. The mere fact that the Maryland acts and the charged conduct did not involve exactly the same co-conspirators, cocaine amounts, sales locations, or temporal timelines does not overcome the similarity between the two sets of acts or render Grigger's testimony insufficiently relevant or probative. The government did not refer to the testimony as propensity evidence during its

summation. Any concerns about the reliability of Grigger's testimony could have been addressed on cross-examination and, in any event, witness credibility is not a consideration in this admissibility analysis. *See Garcia*, 291 F.3d at 136 (describing the Rule 404(b) analysis).

Accordingly, the district court did not abuse its discretion in admitting Grigger's testimony of the Maryland acts under Rule 404(b).

**B.**     *Rule 403*

Rule 403 allows a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, . . . or needlessly presenting cumulative evidence." Fed. R. Evid. 403. While "'a mechanical recitation of the Rule 403 analysis is not required,' . . . 'the district court must make a 'conscientious assessment' of whether unfair prejudice substantially outweighs probative value.'" *United States v. Scott*, 677 F.3d 72, 84 (2d Cir. 2012) (quoting *United States v. Pitre*, 960 F.2d 1112, 1120 (2d Cir. 1992), and then quoting *United States v. Salameh*, 152 F.3d 88, 110 (2d Cir. 1998) (per curiam)).

Although the district court could have conducted a more explicit analysis of the Rule 403 balancing test, there was no harmful error because, as discussed, Grigger's testimony was probative as to disputed, relevant issues and

was not unduly prejudicial in light of the similarity of the conduct and the contemporaneous limiting instruction. *See Williams*, 205 F.3d at 34.

Accordingly, we affirm the evidentiary ruling admitting Grigger's testimony of the Maryland acts.

### III. *The Sufficiency of the Evidence*

All three defendants challenge the sufficiency of the evidence. Brian, David, and Samuel contend, with respect to Counts One and Two, that there was insufficient evidence that they engaged in the underlying drug conspiracy at all, much less one involving at least 280 grams of cocaine base, or that they shot at Dawson in furtherance of such a conspiracy. Brian and David raise sufficiency challenges to their convictions on Count Three for conspiracy to distribute cocaine, arguing that the trial evidence at most showed that they individually participated in a series of drug sales, not that they conspired with others to buy or sell cocaine.

"We review challenges to the sufficiency of evidence *de novo*, and will uphold a conviction if '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Rosemond*, 841 F.3d at 113 (quoting *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016)). In assessing the sufficiency of the evidence, we "view the evidence in the light most

29

favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* (quoting *United States v. Coplan*, 703 F.3d 46, 62 (2d Cir. 2012)).  A defendant asserting a sufficiency challenge "bears a heavy burden, as the standard of review is exceedingly deferential." *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015) (quoting *Coplan*, 703 F.3d at 62).

A.    *Counts One and Two*

To prove a drug conspiracy, the government must show that the defendant knew the conspiracy existed, intentionally joined it with specific intent to commit the object of the conspiracy, and knew or could reasonably foresee that the conspiracy involved the alleged quantity and type of drugs.  *United States v. Valle*, 807 F.3d 508, 515-16 (2d Cir. 2015); *Santos*, 541 F.3d at 70-71. Circumstantial evidence that the defendant associated with co-conspirators in furtherance of the conspiracy can be sufficient for conviction.  *United States v. Aleskerova*, 300 F.3d 286, 292-93 (2d Cir. 2002).  "[T]he government need not show that the defendant knew all of the details of the conspiracy, so long as he knew its general nature and extent." *United States v. Torres*, 604 F.3d 58, 65 (2d Cir. 2010) (quoting *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008)).

To prove that a defendant killed or conspired to kill in furtherance of a drug conspiracy, the government must establish that "*one* motive for the killing (or conspiracy to kill) was related to the drug conspiracy," but it need not "establish that [the] drug-related motive was the sole purpose, the primary purpose, or even that it was equally as important as any non-drug-related purpose." *United States v. Desinor*, 525 F.3d 193, 202 (2d Cir. 2008).

Thus, the issue here is whether the evidence was sufficient for a reasonable jury to find that the three defendants each participated in a conspiracy to distribute at least 280 grams of cocaine base and was motivated by this conspiracy to kill Dawson on June 22, 1994. We conclude that there was, and affirm all three defendants' convictions on Counts One and Two.

There was sufficient evidence at trial that Brian, David, and Samuel knowingly and intentionally participated in the underlying drug conspiracy to distribute at least 280 grams of cocaine in 1994. First, Lewis testified that starting in April 1994, he and Brian sold crack cocaine every day in the 160 Park Hill area and had access to guns for protection. They bought 125 grams of powder cocaine, which yielded 120 to 121 grams of crack cocaine, every three to four days and sold it to customers. They began selling cocaine in rotating shifts after a few weeks. Second, rival dealer Paul Ford testified that both David and

Samuel sold crack cocaine at or around 160 Park Hill in the 1990s. Third, there was testimony that Brian, David, and Samuel violently confronted Dawson after he began selling cocaine at 160 Park Hill over Brian's objections.

Thus, there was evidence that (1) Brian ran a drug-selling operation at 160 Park Hill involving at least 280 grams of cocaine base, (2) Brian protected this area from other drug dealers, (3) David and Samuel also sold crack cocaine in the area, and (4) David and Samuel helped Brian confront Dawson for selling cocaine at 160 Park Hill. Accordingly, there was sufficient evidence for a jury to find that David and Samuel each knew about Brian's conspiracy to sell crack cocaine at 160 Park Hill, joined the conspiracy to sell crack cocaine, and knew or should have known that the conspiracy involved at least 280 grams of cocaine base. *See Santos*, 541 F.3d at 70-71.

There was also sufficient evidence for a jury to find that each of the three defendants killed, and conspired to kill, Dawson while motivated by a desire to further this drug conspiracy. As discussed, there was testimony that Brian did not want Dawson selling crack cocaine at 160 Park Hill and that David and Samuel helped Brian violently confront Dawson for selling cocaine there. On June 22, 1994, David tried to block Lewis's and Dawson's drug sales at 160 Park Hill, and both David and Samuel stood next to Brian during his armed

32

standoff with Dawson. Samuel later pulled out a gun and shot Dawson after they competed for the same sale. Samuel then grabbed Brian and David, who both approached Dawson and fired guns in his direction. A jury could have found that each defendant shot at Dawson and conspired to kill him for reasons related to the underlying conspiracy involving at least 280 grams of cocaine base.

Accordingly, there was sufficient evidence for a jury to find that Brian, David, and Samuel each killed, and conspired to kill, Dawson in furtherance of a drug conspiracy to distribute at least 280 grams of cocaine base.

B. *Count Three*

Brian and David were also convicted of conspiracy to distribute at least 280 grams of cocaine base between 2011 and 2013. First, there was testimony that Brian sold cocaine with Lewis in the 160 Park Hill area every day from March 2011 to November 2011, and that they replenished their supply by buying 10 to 30 grams of cocaine about twice a week. In 2012, Brian bought three batches of powder cocaine -- 950 grams in total -- on consignment and at least seven batches of cocaine -- ranging from 20 to 50 grams each -- with payments upfront. Brian also worked with Lewis in 2012 to buy and sell over 100 grams of cocaine to customers. Second, there was testimony that David sold crack cocaine at 160 Park Hill in 2012 and 2013 as well, and that he assumed a larger role in the

33

drug operation after Brian's arrest by managing the "drug phone" that Brian used to contact customers.  Samuel App. 240.

We conclude there was ample evidence that Brian knowingly and intentionally participated in a conspiracy to distribute at least 280 grams of crack cocaine between 2011 and 2013.  There was also sufficient evidence to support a jury finding that David knew about this conspiracy, joined the conspiracy with intent to help Brian sell crack cocaine in the 160 Park Hill area, and knew or should have known that at least 280 grams of crack cocaine were involved.  Accordingly, we affirm Brian's and David's convictions on Count Three.

## IV.    *Statements Against Penal Interest*

David and Samuel argue that Dawson's testimony that defendants beat and robbed him was improperly admitted as a statement against penal interest.  Samuel additionally asserts that the court erred in admitting Grigger's testimony that Brian made a statement against penal interest to Grigger when they were in prison together in 2013.

We review a decision to admit testimony as a statement against penal interest for abuse of discretion.  *United States v. Gupta*, 747 F.3d 111, 128 (2d Cir. 2014).  Federal Rule of Evidence 804(b)(3) permits the admission of a statement against an unavailable declarant's penal interest if the statement, when

made, had so great a tendency to expose the declarant to criminal liability that a reasonable person in his position would have made the statement only if he believed it to be true, and corroborating evidence clearly indicates the trustworthiness of the statement. *Id.* at 127 (citing Fed. R. Evid. 804(b)(3)).

First, the court conducts "an adequately particularized analysis," *id.* (quoting *United States v. Saget*, 377 F.3d 223, 231 (2d Cir. 2004)), to determine "whether 'a reasonable person in the declarant's shoes would [have] perceive[d] the statement as detrimental to his or her own penal interest' . . . 'in light of all the surrounding circumstances,'" *id.* (quoting *Saget*, 377 F.3d at 231, and then quoting *Williamson v. United States*, 512 U.S. 594, 604 (1994)). The statement "'[need] not have been sufficient, standing alone, to convict [the declarant] of any crime,' so long as it would have been 'probative' in a criminal case against him." *Id.* (quoting *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011)). Second, the court looks for "corroborating circumstances indicating 'both the declarant's trustworthiness and the truth of the statement.'" *Id.* (quoting *United States v. Lumpkin*, 192 F.3d 280, 287 (2d Cir. 1999)). There must be a "strong, [and] not merely allowable," inference of trustworthiness. *Id.* (quoting *United States v. Salvador*, 820 F.2d 558, 561 (2d Cir. 1987)).

## A. *Dawson's Statements*

Ford testified at trial that Dawson told him before the murder that Brian "and his brothers had broke[n] into [Dawson's] car and stole[n] his drugs and his money and they had beat him up." Samuel App. 116.

The district court did not abuse its discretion in admitting Dawson's statement as a statement against penal interest. Dawson was deceased and unavailable to testify. A reasonable person in his position would have perceived the statement as against his penal interest because it implicated him in drug activity, and he would not have made the statement unless he believed it to be true. Two circumstances in particular suggested the statement's trustworthiness: first, that Dawson uttered it to Ford, "a person whom the declarant believe[d was] an ally," and second, that, in making it, Dawson "does not appear to have been attempting to shift criminal culpability from himself." *Saget*, 377 F.3d at 230. In addition, a strong inference of truth arose from evidence that Brian was prepared to use violence to protect the drug operation at 160 Park Hill from rival dealers, Brian disliked that Dawson had started selling cocaine in the area, and David and Samuel both sold crack cocaine for and were involved in this scheme. The admission of Dawson's statement was therefore not an abuse of discretion.

36

David's arguments to the contrary are unpersuasive. Dawson's statement was self-inculpatory because it referred to his drug activity. The fact that Dawson referred to David and Samuel as Brian's brothers, rather than individually by name, does not reflect a lack of personal knowledge that would bar admission of this evidence. Any concerns with witness credibility could have been addressed in cross-examination of Ford or closing arguments. *See United States v. Cacace*, 796 F.3d 176, 192 (2d Cir. 2015) (per curiam).

Accordingly, there was no abuse of discretion and we affirm the decision to admit Ford's testimony of Dawson's statement against penal interest.

**B.** *Brian's Statements*

At trial, Grigger recounted statements that Brian made to him while they were incarcerated at the same facility in 2013. Grigger stated that Brian told him about a conversation that Brian had with Samuel in Staten Island in 2011 or 2012, when Brian expressed concern that Lewis was still alive. Grigger testified:

> [Brian] said that he was with [Samuel] and him and [Samuel] were talking and while they were together, he saw [Lewis]. [Brian] asked [Samuel] why are they still breathing, why is [Lewis] and him still alive. And [Samuel] responded, saying that [Brian] was you know, bugging out. No one was worried about that, that was a long time ago.

Samuel App. 321. Grigger asked Brian to elaborate and understood from his statements that (1) Brian singled Lewis out because Lewis was at the scene when

37

Dawson was shot, (2) Brian asked Samuel why "[Lewis] or anyone else who may have been there that night [had not] los[t] their [sic] life for that particular reason," and (3) Samuel responded that Brian was overreacting because nobody was worried about the shootings. *Id.*

The district court acted within its discretion in admitting Grigger's testimony of Brian's statements. Brian, as a defendant, was an unavailable declarant because he did not testify at trial. *See United States v. Williams*, 927 F.2d 95, 99 (2d Cir. 1991). His statements, taken in context, were against his penal interest because they described his concern when he found out that Lewis, a witness to the shootings, was still alive. A reasonable person would have made these statements only if he believed them to be true. Brian's statements bear indicia of trustworthiness because he was speaking with his brother Samuel, an ally, when he made them and he did not attempt in the statements to shift blame for Dawson's murder away from himself. *See Saget*, 377 F.3d at 230. Moreover, the government presented corroborating evidence of the truth of the statements, including testimony that (1) Brian shot in Dawson's direction shortly after Samuel shot Dawson and (2) Lewis saw Brian run outside, heard gunshots, and found Dawson bleeding in the street, that created a strong inference of trustworthiness and truth.

Thus, there was no abuse of discretion and we affirm the decision to admit Grigger's testimony of Brian's statements against penal interest.

## V.  *Perjury*

David asserts, for the first time, that Ford committed perjury when he testified that he saw David selling crack cocaine around 160 Park Hill in the early 1990s.  David declares that Ford could not have seen him selling crack cocaine because, as his rap sheets show, he was incarcerated during this period.

David's rap sheets, however, do not support this perjury claim.  His rap sheets instead establish that he was arrested in July 1990, incarcerated in January 1991, and released in November 1993.  He was arrested again in January 1994 and March 1994 on separate offenses.  The state court issued a bench warrant for his arrest in April 1994 but vacated the warrant in January 1995.  Because the rap sheets do not reflect a continuous period of incarceration and because David raises no other arguments to substantiate his claim, we decline to vacate his convictions on this ground.

## *CONCLUSION*

For the reasons set forth above, the judgments of the district court are **AFFIRMED**.